Pages 1 - 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

OPENTV INC.,                    )
                                )
          Plaintiff,            )
                                )
   VS.                          )      NO. C 14-01525 RS
                                )      NO. C 14-01723 RS
NETFLIX INC.,                   )
                                )
          Defendant.            )
_____ )

                           San Francisco, California
                           Thursday, November 13, 2014

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    KIRKLAND & ELLIS LLP
                    3330 Hillview Avenue
                    Palo Alto, California 94304
               BY:  **JOHN R. EDWARDS, ESQ.**
                    **BRIAN W. LEE, ESQ.**

For Defendant:
                    DURIE TANGRI LLP
                    217 Leidesdorff Street
                    San Francisco, California 94111
               BY:  **DARALYN J. DURIE, ESQ.**
                    **CLEMENT S. ROBERTS, ESQ.**
                    **LAURA E. MILLER, ESQ.**

Reported By:        James C. Pence, RMR, CRR, CSR No. 13059
                    Official Court Reporter

1  **Thursday - November 13, 2014**                            **1:39 p.m.**

2                        **P R O C E E D I N G S**

3                          **---o0o---**

4       **THE CLERK:**  C 14-1525 and C 14-1723, OpenTV versus

5  Netflix.

6     Counsel, please state your appearances.

7       **MS. DURIE:**  Good afternoon, Your Honor.  Daralyn

8  Durie, Clem Roberts, and Laura Miller all from Durie Tangri on

9  behalf of Netflix.

10      **THE COURT:**  Good afternoon.

11      **MR. EDWARDS:**  Good afternoon, Your Honor.  John

12  Edwards on behalf of plaintiff OpenTV and Nagra France.  Also

13  with me is Brian Lee with Kirkland & Ellis.  If I may, I'd also

14  like to introduce -- we have a representative from OpenTV here,

15  Brian Platt.

16      **THE COURT:**  Good afternoon.  Good afternoon to all of

17  you.

18     We have a -- both a case management conference and a

19  motion for summary judgment to deal with.  So what I'd propose

20  to do is to take up the summary judgment motion first, and then

21  we'll go to the case management conference.  But there is an

22  aspect of the case management conference that I'm going to

23  discuss, and I might as well discuss it here just to alert you

24  to the fact that my -- my rule, as you'll see in the standing

25  orders that I have, is that without any further explanation or

1    reason, I limit parties to one summary judgment motion.

2        Now, that doesn't mean that there wouldn't be a

3    circumstance in which, if a party can explain to me why it's

4    necessary to have more summary judgment practice, I won't agree

5    to it.  It's certainly not an ironclad rule, but this

6    coming-right-out-of-the-box-a-summary-judgment-motion -- I just

7    want to alert the parties that if the defendants for now want

8    to bring a summary judgment motion in addition to this, they're

9    going to have to explain to me why there should be an

10   additional motion because I have, in patent cases in

11   particular, had the experience of seriatim summary judgment

12   motions, and that's a bad experience.

13       So be aware that, you know, I will not simply open the

14   gate and just have parties file summary judgment motions

15   whenever they feel like it.

16       **MS. DURIE:**  Understood, Your Honor.  I appreciate

17   that.

18       This is, as you know, at present an 11-patent case --

19       **THE COURT:**  Yes.

20       **MS. DURIE:**  -- and we want to try to have a process

21   for making this manageable so that we can move forward in an

22   orderly fashion.  We don't intend to bring the Court with

23   multiple rounds of summary judgment --

24       **THE COURT:**  Okay.

25       **MS. DURIE:**  -- motions.  I understand and I appreciate

1  the caution.  If the Court were to say under no

2  circumstances --

3          **THE COURT:**  No.

4          **MS. DURIE:**  -- would you be -- then -- then thank you.

5          **THE COURT:**  I'm certainly not going to say that, and I

6  am not suggesting you weren't fully aware of that as being the

7  way I want to proceed.  But I -- and I also am not suggesting

8  there isn't any -- there is -- it makes sense, however I come

9  out on this particular motion, to have this question brought at

10 this point, and I don't have a problem with that.

11         So I'm not saying there's anything untoward in this.  I

12 just wanted to alert the parties right out of the box that --

13 that it's not going to be every week a new motion.

14         **MS. DURIE:**  Understood.

15         **THE COURT:**  So as long as you understand that, that's

16 fine.

17         So let's -- let's go to the summary judgment motions.  I

18 understand --

19         **MS. DURIE:**  And if I may, Your Honor --

20         **THE COURT:**  Yes.

21         **MS. DURIE:**  -- my partner Clem Roberts is going to be

22 arguing the summary judgment motion.

23         **THE COURT:**  Very good.

24         **MS. DURIE:**  Thank you.

25         **THE COURT:**  My understanding is that this motion is

 1    directed towards three of the patents.  As Ms. Durie just

 2    noted, we have more patents in the case, but these particular

 3    patents -- the motion is invalidity under Section 101, the

 4    patent-eligible subject matter issue, which is now a popular

 5    one for us to be dealing with.  And it involves the '169, the

 6    '691, and the '268 patents.

 7         And as I read it, the -- distilling it down, it's whether

 8    or not these patents do something other than present an

 9    abstract idea that is not subject to patent protection, and we

10    all know that the *Alice* case is of particular moment in this

11    discussion.  So I'm aware of that.

12         I suppose before I -- and I'll look to the moving party to

13    start the discussion, but I guess I had a preliminary question,

14    and that is more process than substance here, and that's just

15    the role of experts in this particular type of inquiry.  The --

16    Dr. Polish -- am I pronouncing it right?  Dr. --

17              **MR. EDWARDS:**  Yes, Your Honor.

18              **THE COURT:**  -- Polish or Polish?

19              **MR. EDWARDS:**  Polish.

20              **THE COURT:**  I read the declaration that was submitted;

21    and frankly, a good portion of it reads like an additional

22    legal brief to me.  It's not what I think is really what I

23    would look for for expert testimony.  I think it's primarily a

24    legal question for me to answer.  And having an expert, no

25    matter how eminent, saying, "In my opinion, this is, you know,

1  protectable subject matter" or what have you, it's really the

2  call for me to make.

3      So I'm not suggesting that there aren't aspects of the

4  declaration that are appropriate expert material, but I suppose

5  my basic threshold question is:  What does -- what do experts

6  add to this equation?

7          **MR. EDWARDS:**  Yes, Your Honor.

8      So experts in this case add the understanding of a person

9  of skill in the art.  Here, what we're --

10          **THE COURT:**  Where does -- that's -- I understand that.

11  Where does a person skilled in the art -- certainly, something

12  I'm used to in claim construction is that we sometimes have

13  experts saying to me, "Well, a person skilled in the art would

14  understand this term to mean this."  But a person skilled in

15  the art -- how does that really dovetail to the question of

16  whether or not it's patentable subject matter, which is a legal

17  question?

18          **MR. EDWARDS:**  Yes, Your Honor.

19      So what we're seeing here is -- you're correct that, with

20  respect to whether it's patentable subject matter, is a legal

21  issue, but there's going to be the underlying factual issues.

22      Here, what's being argued by Netflix is that the -- these

23  patents can be actually distilled down into something very

24  simple and also destroying all of what the claims said.

25  They're taking out all the elements and describing it in a way

1    the patent actually doesn't -- the claims don't even actually

2    read.

3        Here, what the expert adds is the understanding of a

4    person skilled in the art.  Reading the claims, what is the

5    scope?  What's been described is here's an abstract idea as we

6    see in the -- what's being described in their opening brief,

7    and then the question is:  Does that -- does that "I did"

8    they're describing actually fall within the scope of what the

9    claims -- of the claims of the patents issue?

10        **THE COURT:**  Well, I suppose -- I suppose an expert can

11   opine on what -- what the -- what the patent is -- is

12   purporting to cover and how, if it's so -- how the method would

13   operate or what have you.

14        But I assume you agree with me that the expert can't say,

15   "In my expert opinion, this is patentable subject matter" or

16   that "This is an" -- "this is an abstract" -- if it was going

17   the other way with an expert, "This is nothing but an abstract

18   idea."  I mean, an expert wouldn't advance that argument

19   because that's a question for me to decide.  And no matter how

20   learned the expert is, the expert is not making a legal call.

21        **MR. EDWARDS:**  That's correct.  So the expert is not to

22   offer the --

23        **THE COURT:**  The ultimate question.

24        **MR. EDWARDS:**  -- the ultimate conclusion on the legal

25   issue.

1     **THE COURT:**  Okay.

2     **MR. EDWARDS:**  But here, what's being argued is here's

3  an abstract idea, and it reads on the patents.

4     **THE COURT:**  I understand you're saying -- you're

5  advancing the expert to say it's not as simple as they say it

6  is.  I understand that.  But just to tell you, I'm still kind

7  of ruminating on what, if any, significance I give to the

8  expert opinion.  But I jumped the gun a little.

9     So let me go back to the moving party and have you begin,

10  and that's Mr. Roberts.

11     **MR. ROBERTS:**  Thank you, Your Honor.

12     Just to answer your question from our perspective --

13     **THE COURT:**  Uh-huh.

14     **MR. ROBERTS:**  -- the expert doesn't have any

15  relevance.  I'm sure that's not a surprise.  The only --

16     **THE COURT:**  He doesn't have any --

17     **MR. ROBERTS:**  He doesn't have any relevance --

18     **THE COURT:**  Relevance.

19     **MR. ROBERTS:**  -- to this motion.

20     The only situation in which an expert might have relevance

21  is if there were a subsidiary factual question that were

22  specifically in dispute for which expert testimony would help

23  resolve it.  What I heard opposing counsel say is "Well, the

24  scope of the claims..." and he offers the perspective of a

25  person of ordinary skill in the art.  That's really a question

1  of claim construction.  Claim construction is also a purely

2  legal issue.

3      So to the extent to which the expert is being offered to

4  opine on the scope of the claims, that is something this Court

5  can consider.  I'll note, Your Honor, for example, in *buySAFE*

6  *v. Google*, which is a recent Federal Circuit decision

7  post-*Alice* not cited in their brief, that was a motion under

8  Rule 12; right?  It was a motion to dismiss, and the Federal

9  Circuit upheld it, no expert testimony of any kind, and we've

10  given a number of examples of Rule 12 motions.

11      So I think expert testimony is not relevant.  I think

12  there could potentially hypothetically be a situation where it

13  would be relevant, but there are no specifically disputed

14  factual issues of the kinds for which expert testimony might

15  conceivably be relevant; and therefore, this expert's testimony

16  is not relevant.

17          **THE COURT:**  Okay.

18          **MR. ROBERTS:**  Let me start --

19          **THE COURT:**  Let's -- I don't know if we're going to

20  do -- if you want to go through this patent by patent, but I

21  think to some extent there are -- there are different arguments

22  with respect to each of these patents.  So I was going to

23  suggest that we start with '169 and march through it.

24          **MR. ROBERTS:**  Sure.

25      If I could, Your Honor, I want to start with a couple of

1  important sort of principles which I -- to guide the

2  discussion, and we have some slides up here.

3      So the first one is that specificity is not a cure for

4  abstraction, and the reason I'm saying this is because this has

5  come up a number of times in their opposition brief.  "E equals

6  MC squared" is extremely specific.  We know exactly what it is,

7  but it's also abstract.  Specificity and abstraction are

8  orthogonal.

9      Narrowness.  Narrowness is also not a cure for

10  abstraction.  This is a quote from *Mayo*, and *Mayo* says very

11  explicitly, "Our cases have not distinguished among different

12  laws of nature according to whether or not the principles they

13  embody are sufficiently narrow.  The cases have endorsed a

14  bright-line prohibition against patenting laws of nature,

15  mathematical formulas and the like, which serves as a somewhat

16  more easily administered proxy for the building-block concern."

17      So the question is it doesn't have to be directed to a

18  building block per se.  If it's abstract, that's a proxy for

19  the building-block concern.

20      And finally, Your Honor, complexity is also not a cure for

21  abstraction.  This is the claim, for example, from *Accenture v.*

22  *Guidewire*, which was decided before *Mayo*.  It is far more

23  complex with far more pieces of equipment and far more moving

24  parts than any of the claims at issue here.  And it was not a

25  close case, even before the guidance in *Alice*, and that's

1   because conventional computers are also no cure for

2   abstraction.  That comes up in *Alice*, but it also comes up in

3   *Digitech* and in *buySAFE*.

4       Now, I want to pause for a moment on *Digitech* and *buySAFE*

5   because these are the two precedential reported Federal Circuit

6   decisions post-*Alice*, and they don't cite either of them in

7   their opposition.

8       *Digitech* says very specifically that the claim at issue

9   there was abstract because it describes a process of organizing

10  information through mathematical correlations and is not tied

11  to a specific structure or machine.  That is the Federal

12  Circuit's latest pronouncement about what the *Alice* test means

13  with respect to conventional computers.

14      **THE COURT:**  Well -- but I have to tell you that I

15  think the decisions are not suggesting in any way that they

16  haven't gotten it right, but they're not very helpful for

17  applying -- they all say the same thing.  You know, it's

18  different ways of saying an abstract idea cannot be patented,

19  can't -- the patent coverage can't be obtained.  But if there's

20  an inventive concept in Step 2, then perhaps it's eligible for

21  patent protection.  You figure it out.

22      **MR. ROBERTS:**  Right.

23      **THE COURT:**  I mean, effectively, that's what I read.

24  And each decision sort of says the same thing, and that's nice,

25  and they're right, but I don't think they guide us very much.

1          **MR. ROBERTS:**  So here's the guidance I would take from

2   *Digitech* --

3          **THE COURT:**  Yes.

4          **MR. ROBERTS:**  -- two things.  The first is that data

5   manipulation per se is abstract.  If it's data manipulation, if

6   all I'm doing is manipulating data --

7          **THE COURT:**  Right.

8          **MR. ROBERTS:**  -- that is an abstract concept.

9      And the second is that there's a difference between a

10  conventional machinery or a conventional computer and a

11  specific structure or machine.  And so when we look at *Alice*

12  and we talk about *Alice* having this bright-line rule that

13  conventional computers are not enough, that the Federal Circuit

14  is contrasting that with specific structures or machines.

15      So that's the guidance and the only guidance I'm

16  suggesting to the Court from *Digitech* --

17         **THE COURT:**  Okay.

18         **MR. ROBERTS:**  -- right?

19      Let me move on to the specific patents, which is what

20  Your Honor wanted to start with.  And I have the *Alice/Mayo*

21  framework here, but Your Honor is familiar with it.  So let me

22  move on.

23      Let's take, to start, the '169 patent, which is the first

24  patent.

25         **THE COURT:**  Right.

1          **MR. ROBERTS:**  And I have Claim 1, which is the
2    exemplary claim from the '169 up here on the board.  And it
3    calls for receiving one or more directives which are indicative
4    of an audio, video, or graphic presentation that requires a set
5    of resources, determining whether or not that directive
6    includes a prerequisite directive, and then either initiating
7    or prohibiting the initiation, depending upon whether or not it
8    does include a prerequisite directive.
9          This, Your Honor, is an abstract idea.  It is a basic
10   mental process.  Let's walk through it step by step.  Here is
11   the docket text from the Court's order setting the case
12   management conference.  This is a directive from the Court to
13   the lawyers in the firm.  When I got this, I received one or
14   more directives which were indicative of a set of audio, video,
15   and/or graphic presentation that requires a set of resources.
16         I am making the presentation to you right now.  It
17   requires resources, including the court reporter, Your Honor's
18   time, the computers, the clicker.  This is a directive that is
19   indicative of a set of resources, a presentation that requires
20   a set of resources.
21         **THE COURT:**  That was -- your analogy in the brief was
22   bringing equipment into the -- to the building.  I see you're
23   focusing on court analogies, very useful for me.
24         **MR. ROBERTS:**  Yes.  We want to make sure that it's
25   right.

1    So then what do I do with this, Your Honor?  I determine

2  whether or not that directive includes a prerequisite

3  directive.  Does it include a prerequisite directive?  Well,

4  this one does not.  There is nothing in here that is a

5  prerequisite directive.  It doesn't have something saying that

6  a subset of the resources is a prerequisite for initiating the

7  presentation.

8    Okay.  And if there is not, I then go to C, and I initiate

9  the presentation in response to determining that one or more

10  directives do not include the prerequisite directive.  I

11  started the presentation in response to that.  I have literally

12  just performed the claim based on the Court's order in the

13  event that it does not include a prerequisite directive.

14  That's abstract.  I've just done it.

15    Now, let's go back and say, "Well, what about the case

16  where it does include a prerequisite directive?"  So I've

17  amended the Court's order here to include one, and you can see

18  at the bottom I've added, "If the parties wish to make a prereq

19  presentation, the parties must reserve courtroom equipment by

20  visiting website or by calling 1-800-RESERVE."  And this is --

21  we have just made this up, Your Honor.  This is a prerequisite

22  directive even, I would say, under Dr. Polish.

23    One of the examples Dr. Polish gives of directives in

24  Paragraph 20 and 21 of his declaration is he gives HTTP

25  addresses and says that's a declarative statement using a

1   computer language.  This is a prerequisite directive.  It

2   indicates that it is a prerequisite that we reserve computer

3   equipment.  It tells you what you want, what you have to do,

4   but doesn't tell you how to do it.  You have to go there and do

5   it.

6        Then we determine whether or not the one or more

7   directives includes a prerequisite directive which indicates

8   the acquisition of a subset of the resources is a prerequisite.

9   Well, this does.  It indicates that a subset of the resources,

10  the courtroom equipment, obtaining those, is a prerequisite for

11  me to begin the presentation.  And then what do I do?  I

12  prohibit the initiation of the presentation until I have made

13  that reservation, until the resources are acquired.

14       Again, this is an abstract idea.  It is a basic mode of

15  interacting.  There is no computer mentioned in the claim.

16  There is no equipment mentioned in the claim.  I don't even

17  need to use the prerequisite directive to obtain the resources.

18  I just wait until the resources are obtained.

19            **THE COURT:**  The suggestion that OpenTV makes is that

20  this is all because this is preconstruction, claim

21  construction, that you're giving an extremely broad

22  construction to these terms and that at the very least we need

23  to await claim construction because they're going to be

24  arguing, as I understand it, a much narrower construction of

25  some of these terms, perhaps, you know, some of the ones you've

 1    focused on.  So --

 2              **MR. ROBERTS:**  So --

 3              **THE COURT:**  -- like "prerequisite directive."  I don't

 4    know if that's one of the claim terms they're going to say that

 5    needs to be construed, but why -- they're having to stake out

 6    that ground.  Can I leap forward and say, "Well, it doesn't

 7    matter.  I simply find that this is an abstract idea that's not

 8    subject to protection"?

 9              **MR. ROBERTS:**  Absolutely.

10         Three points here.  First, again, as we know, courts

11    routinely do this before claim construction.  It is in

12    Your Honor's discretion to wait until --

13              **THE COURT:**  I'm not sure about routine, but I've done

14    it.

15              **MR. ROBERTS:**  Okay.

16              **THE COURT:**  So it's doable.

17              **MR. ROBERTS:**  It's clearly in Your Honor's discretion

18    to wait until after claim construction, but the question is:

19    Why would you?

20         So the reason courts would wait is because they've

21    identified a meaty issue of claim construction that could

22    impact the outcome.  The only thing they have pointed to here

23    are prerequisite directives.  That's the only thing they said,

24    and their expert has actually given a construction of

25    prerequisite directives.

1          So what their expert said is directives in the '169

2     patent are declarations or other statements that are generally

3     formed using a declarative computer language which allows one

4     to specify what you want and not how to get it such as, for

5     example, HTML, JavaScript, and CSS.  So let's look at it.

6          This is their own expert.  It's a statement or other -- a

7     declaration or other statement.  So it's not even a

8     declaration.  It's the declaration or statement that is

9     generally -- not always but generally formed using a computer

10    language and, even so, can be formed using any one of a large

11    number of computer languages.

12         Taking their expert at his word, this does not result in

13    patent-eligible subject matter because this is not a specific

14    transformative limitation that limits this to a particular

15    technology.  It doesn't even limit it to a particular computer

16    language.  It doesn't even limit it to a particular declaration

17    or statement.  It's generally but not exclusively formed and --

18         **THE COURT:**  In your briefs, you were -- in the reply

19    brief, I think, you were saying, "Well, if" -- "if the position

20    of OpenTV is that we have to await claim construction, then

21    it's their obligation at this juncture in response to the

22    motion to come forward with effectively what their claim

23    construction position is."

24         And you're sort of taking the declaration and saying,

25    "We're assuming that's what they're going to be saying."

1    My question is:  Is there any legal support for the notion

2    that to respond to an earlier summary judgment motion like

3    this, that it effectively shifts the burden or accelerates

4    their burden to provide me with what their proposed

5    construction is so that then you can say, "Well, we'll accept

6    that, and we still get summary judgment"?

7    **MR. ROBERTS:**  Two -- two things.  *Cyberfone v. Cellco*

8    *Partnerships*, 885 F.Supp.2d, 710, District of Delaware, says

9    because, quote, "the plaintiff did not explain how claim

10   construction might alter the Court's 101 analysis, the Court

11   concludes it may proceed without the benefit of claim

12   construction."

13   So it's not -- I'm not saying that they have to proffer a

14   specific construction, but they do have to explain how a

15   construction would change the result, which they haven't done.

16   Second, as I'm sure the Court knows, claim construction is

17   something the Court can do on summary judgment.  A lot of the

18   cases where courts wrestle with this are not summary judgment

19   cases.  They're 12(b)(6) cases.  And if there's a question

20   there, then you have to resort to saying, "Well, we're going to

21   resolve this in, you know, the light most favorable to the

22   nonmoving party."  Courts routinely resolve issues of claim

23   construction in the context of summary judgment.  That's

24   something that the Court does.

25   And then third, I would say with respect to claim

construction specifically is, as we have pointed out, it
doesn't matter how these terms are actually construed
specifically.  Even if you do it as their expert has said, it
doesn't help them.  That's why there's no issue here; right?

If there were disputed issues of claim construction and
they could explain, "Hey, Your Honor, if prerequisite
directives means a particular type of declarative statement,
then this wouldn't be patent.  This wouldn't be ineligible" --
right? -- we might have a dispute.  But even if it means a
specific type of programming language or a specific type, which
is not what their expert said at all, it wouldn't affect the
outcome because it would just be data manipulation --

              **THE COURT:**  Right.

        **MR. ROBERTS:**  -- right?  It's clearly not a specific
programming technique.  It's clearly not a specific structure.

And so what is the possible outcome?  What are we hoping
to learn in claim construction that could alter this other than
"Hey, just wait and, you know, trust us later on.  This will
come," which is all I understand them to be arguing?

              **THE COURT:**  Before we -- are you -- have you gone
through '169 because what I'm kind of --

        **MR. ROBERTS:**  I wanted to add one thing on '169 --

              **THE COURT:**  Go ahead.

        **MR. ROBERTS:**  -- which is I wanted to ask the Court,
if it would, to compare the claims of the '169 with the claims

invalidated in *Eclipse*, which I have up here, and also the
claims in the *Comcast* case.  And the reason these are so
important is because they're incredibly similar.

So this is the claim from *Eclipse v. McKinley*.  It's from
Judge Wu in the Central District of California, and it calls
for initiating a notification communication to a personal
communication device associated with the party.  Then during
that, you receive a response which indicates whether or not the
parties associated with the communication device will perform
the task.

If -- this is -- if the party is willing to perform the
task, you wait until further notification to provide
performance of the task in monitoring for detection of one or
more events to indicate accomplishment of the task by the party
comprising at least one of the following.  And then if the
party is not willing to perform the task, you initiate another
communication.

This is that same structure.  You receive a notification.
You make a determination.  If the determination is one thing,
you wait.  If the determination is another thing, you proceed.
It's the exact same structure.

The *Comcast* case, Your Honor, which is cited in the
briefing, has also extremely similar claims.  In the *Comcast*
case -- and this is 2014 West Law 3542055 -- it called for a
telephony network optimization method comprising receiving a

1    request from an application to provide the application service

2    on a telephony network and determining whether a telephony

3    parameter associated with the request requires acceptance of a

4    user prompt to provide the application access to the telephone

5    network.

6         That is exactly the same as the first two steps here.  You

7    receive something, and then you determine whether it requires

8    something else.  In both of these two cases, the Court said,

9    "No need to wait for claim construction.  We can proceed, dead,

10   dead, dead."  This case is squarely -- for the '169 is squarely

11   between *Eclipse* and *Comcast*.  There's no reason to wait.

12        **THE COURT:**  Okay.  Why don't we -- rather than having

13   you go through the three, why don't we go kind of --

14        **MR. ROBERTS:**  Back and forth?

15        **THE COURT:**  -- like I do with claim construction, back

16   and forth, and then I won't lose track of the arguments.

17        So why don't you go ahead, Mr. Edwards, and respond on the

18   '169.

19        **MR. EDWARDS:**  Yes, Your Honor.

20        If I may, let me start by recognizing that these -- these

21   other cases -- these other decisions are really not relevant to

22   the issue.  Much like claim construction, which is a question

23   of law, you don't look to another court's opinion on a

24   different patent as to what your patent means.

25        You look at the patent itself.  You look at the

 1   specification.  You look at it from the eyes of a person of

 2   ordinary skill in the art.  What is the scope of your patent?

 3   You wouldn't look at some completely different patent in a

 4   different court and decide, "I'll construe these terms the same

 5   because that's how somebody else construed it on a different

 6   patent."

 7        What do these decisions provide, though?  They provide the

 8   framework.  The framework, as announced in *Mayo* and reaffirmed

 9   in *Alice*, is -- is deciding how do we find out what's

10   patentable subject matter and what's unpatentable subject

11   matter.

12        Here, the Court has provided some guidance.  The Court has

13   said there are categories of ideas that can't be patented.

14   They're not eligible.  What if they -- they've identified

15   three:  Laws of nature, natural phenomena, abstract ideas.

16   That's one category -- or that's one group.  But outside of

17   that, we have the patent-eligible subject matter.

18        What does the Court -- what guidance has the Court given

19   us to identify what's outside of natural phenomena, laws of

20   nature, and abstract ideas?  One, *Alice*, inventive concepts.

21   How do we reach inventive concepts?  Well, the Court provided a

22   two-step framework.  What Netflix is attempting to do is to

23   jump over that first step.  Is there an abstract idea?

24        Here, the sole argument that they make that the claims of

25   the '169 are directed to an abstract idea is that they could be

mental steps performed in the mind or, as they stated in their
opening brief, could be done on pen and paper -- done through
pen and paper.  That's not true.  The claims can't be done on
pen and paper, as we responded in our opposition, as also
supported by Dr. Polish.  They're also not -- the claims are
not directed to being able to do this in mental steps.

When we look at the patent itself, what was the patent
directed to?  What was directed to innovating over existing
conventional content delivery systems?  There was a physical
technical problem here with the '169 that the '169 was
attempting to address.  In these preexisting content delivery
systems, they recognize that content creators didn't have any
control over how the content was being presented to end users.

These -- you know, these patents were originally from
OpenTV.  OpenTV was founded right here in San Francisco, 1996.
They're a leading cutting-edge provider of Set-Top Box,
Middleware Solutions, and web content delivery systems.  And
this is the technology that their engineers are working on,
recognizing these are problems with the existing technologies.

How do we change them?  How do we make them better?
Nobody disputes that taking something and making it better and
proving it is patentable.  Take a hammer, make a better hammer,
that's patentable.  Now, just taking the hammer and saying
you're going to use it in a conventional way, that's not
patentable.

1              **THE COURT:**  Well -- but, see, that's what they're

2     saying all you're doing -- that's all you're doing, according

3     to their interpretation.  You -- what you said is the goal is

4     understandable that the technology is developing, and this is a

5     mechanism where you can present information in a more effective

6     way and all of that, certainly a laudable goal, understandable

7     and all.

8          But what does the patent do other than say, "That's what

9     we want to do"?  I mean, it's -- "that's our intention, to try

10    to achieve this, you know, collection of information and

11    targeting, programming" and all that sort of thing, but how

12    does it do it?  I mean, it doesn't seem to me to be easily

13    understood as to -- other than, again, saying, "This is what

14    we'd like to have happen."  Well, that's good, but it doesn't

15    give you much guidance, does it?

16         I mean, what -- I know it's an amorphous question, but it

17    seems to be amorphous language in the patent.

18             **MR. EDWARDS:**  Sure.

19         The claims give guidance in the context of -- for a person

20    skilled in the art.  What were the patents directed at?  It was

21    a content delivery system.  It was a conventional content

22    delivery system.  How do you make it better?  We're going to

23    introduce new technology into that system.

24             **THE COURT:**  Well, what is the new technology?  Because

25    what they're really -- what it's saying is "We really want to

1  be targeted, specific, directed," all this sort of stuff.

2  Great, but then where is the -- where is the guidepost to how

3  to do it in this patent?

4        MR. EDWARDS:  Right.  So the guidepost on how to do

5  that --

6        THE COURT:  Yeah.

7        MR. EDWARDS:  -- is what we see in the claims.

8        THE COURT:  Okay.

9        MR. EDWARDS:  So here we have in the claims it's the

10  introduction within the system, the use of directives, and even

11  more specifically prerequisite directives.  And all of these

12  analogies that we've been hearing from -- from Netflix don't

13  actually apply to the claims.

14        THE COURT:  But how -- so jumping ahead on the claim

15  construction point, Netflix has shown me a clip of something

16  from your expert declaration where Dr. Polish is perhaps giving

17  a proposed construction of "prerequisite directive."  Is that

18  your proposed construction?

19        MR. EDWARDS:  So for prerequisite directives, that --

20  it is our -- our proposed construction that that is not -- that

21  is limited to.  It's a specific type of directive that's in a

22  computer language expression.

23        THE COURT:  Well -- so -- so is it fair to say --

24  their point is we certainly don't have to wait for claim

25  construction because it's your obligation at this point not

1    necessarily to give me your specific proposed construction but

2    to tell me why claim construction could make a difference.

3        I mean, your big argument against their position, as I

4    understand it, is they're -- they're dumbing down your patents.

5    They're interpreting it in this extraordinarily broad amorphous

6    fashion, and then they're pronouncing it a nonpatentable

7    abstract idea.  That's what I'm reading you to say.

8        Is that a fair summary of your position?

9            **MR. EDWARDS:**  Certainly onefold, yes.

10           **THE COURT:**  Okay.  So if that's -- if that's your

11   position, then aren't they correct that it is at this point,

12   then, your follow-up to that to say, "And when" -- "we're going

13   to advance this particular concept in our construction

14   arguments.  And once you embrace that, Judge, then it's going

15   to narrow this patent, you know, in a fashion that it will be

16   clear to you it isn't as broad and amorphous as they're

17   contending," and have you done that?

18           **MR. EDWARDS:**  That's what the claims do.

19           **THE COURT:**  Well -- but have you given me your

20   proposal as to how the terms of those claims should be

21   construed that will have this narrowing function?

22           **MR. EDWARDS:**  Well, that is in part what Dr. Polish

23   provides, is additional understanding of what is the scope of

24   the claims.

25       As we've identified, prerequisite directives and being

1    able to use these prerequisite directives in a content delivery

2    system was something that was changing the existing technology,

3    in a sense opening the hood of a conventional content delivery

4    system and adding something new, adding these directives, these

5    prerequisite -- prerequisite directives so that content

6    providers could be able to prohibit the presentation -- the

7    initiation of their presentation until these prerequisites --

8    this subset of content was available.

9         What was recognized in the art is that you had a system

10   that didn't have that capability to prohibit the initiation of

11   presentations based on what the content provider was saying --

12        **THE COURT:**  Well, doesn't the patent, though, then

13   teach how you're going to go about achieving this aspirational

14   goal?  I mean, is -- it certainly wouldn't be patentable if it

15   just says, "Oh, we'd like to make this more effective by having

16   some threshold triggers that result in a more directed set of

17   information being disseminated."

18        Okay.  But that by itself can't be patentable.  It's got

19   to then -- and we're going to do it by doing it this way.

20   We're going to -- this is how we're going to set it up.  Don't

21   you need that?  And maybe that's in the patent.  That's my

22   question.

23        **MR. EDWARDS:**  So that's certainly in the patent, and

24   it's also in the claims.  So when we see an example from the

25   patent, it talks about, you know, what is a prerequisite

directive.  It gives us a specific example, you know, META name

prerequisite.  It was a way of indicating -- this content, the

background MPEG -- I'm looking at Page 6 of the plaintiff's

opposition.

That's from the specification.  That's actually a

prerequisite directive.  That's an example of how content

providers can now convey through these modified conventional

content delivery systems what needs to be present, what's more

important before initiating the initiation of the video.

You see that in the claims.  You see that you're receiving

directives.  You're receiving prerequisite directives.  You're

determining -- your system is determining:  Is there a

prerequisite directive?  Can I initiate, or do I need to wait?

It's also prohibiting -- the system now has to be changed.  So

it's going to be prohibiting the initiation of the presentation

until all of the resources that are identified, the subset of

resources that are identified by the prerequisite directives,

are present.

That's the change in the system.  In a way, that's how the

claims are capturing how the engineers opened up the hood,

introduced these -- these actual changes to their system, and

made something better, more improved where now content

providers have control over the system, and it provides a

better experience for the users.

**MR. ROBERTS:**  Your Honor, can I respond briefly?

1          **THE COURT:** Okay. Well, first, let me make sure --
2    are you -- have you completed your discussion on '169,
3    Mr. Edwards?

4          **MR. EDWARDS:** One additional point, and that is --

5          **THE COURT:** Okay.

6          **MR. EDWARDS:** -- that there is a dispute as to fact
7    here. What we've seen from Netflix is a number of analogies
8    and descriptions of what the claims cover. That is a question
9    of fact. Does this analogy fit within the claims much like
10   infringement analysis? Yes, claim construction, issue of law,
11   but does something that's accused of infringement fit within
12   that scope of the claims?

13         **THE COURT:** I'm not sure where the disputed issue of
14   fact, though, is in here. What's the factual question that I
15   need to resolve before I can answer that question?

16         **MR. EDWARDS:** Oh. The factual issue is whether the
17   description of the patent actually fits within the scope of
18   what the claims are intended to cover.

19         **THE COURT:** Okay.

20         **MR. ROBERTS:** Couple of specific points.

21         **THE COURT:** Okay.

22         **MR. ROBERTS:** First, opposing counsel started by
23   saying that other patents or other decisions are of limited
24   relevance here. I think that's just flat wrong. *Alice*, for
25   example, says it resolves the question about whether or not the

1    claim in front of it is directed to an abstract idea by looking

2    at its prior precedence.

3          *Gottschalk v. Benson* does the same thing.  *BuySAFE v.*

4    *Google*, Federal Circuit case post-*Alice*, does the same thing.

5    *McRO*, the decision from -- another decision from Judge Wu, says

6    specifically that if you look at the pattern of decisions, that

7    the, quote, "heavy work is being done by characterization of

8    past decisions."  That is, in fact, exactly the way the

9    guidance from the Supreme Court as to how it is --

10         **THE COURT:**  No.  I interpreted that to say a variance

11   on what I said at the beginning, which is the case authority is

12   useful to give us the guidelines of analysis, how we go about

13   the analysis.  But the particular patents at issue and whether

14   or not they're deemed to be patentable subject matter or not is

15   not directly helpful because we've got, you know, a different

16   patent.

17         And so I don't think I disagree with that.  I mean, these

18   cases are useful.  You know, we now have the understanding that

19   simply the need to utilize a computer to achieve the ends

20   doesn't make a patentable subject matter.  Well, that's

21   helpful.  So we have that.

22         But I think, you know, Mr. Edwards's point is a fair

23   point, that, you know, when Judge Wu is considering a patent

24   that does something entirely different than what this patent

25   does and if he determines it's not patentable subject matter,

 1    I'm not sure how helpful that is to me.

 2            **MR. ROBERTS:**  If it's entirely different, I agree.

 3    But the reason I pointed to, for example, *Eclipse* and *Comcast*

 4    is because they're not entirely different because they actually

 5    have, when you look at it, very much the same structure as this

 6    patent.

 7            **THE COURT:**  Okay.

 8            **MR. ROBERTS:**  Second, he said that -- he gave in and

 9    said, "Oh, well, you know, let me give you an example from the

10    specification of a directive."  *Accenture* disposes of that.

11    Examples from the specification are not helpful.  What we're

12    required to look at is what's called out in the claims.

13        Their expert has said what they think a prerequisite

14    resource is, and opposing counsel has not disclaimed it.  In

15    fact, he said, "Yes, that's what we're advocating."  We are

16    perfectly fine using for purposes of this motion only their

17    expert's statement about what a prerequisite directive is.

18    It's not limiting.

19        I'll point out in addition in the specification itself,

20    Column 47, Lines 5 through 10.  It says, "The declarations or

21    other statements used in the creation and/or manipulation of

22    resources and content in this document may generally be

23    referred to as directives."  That's a lexigraphical definition

24    of what a directive is.  I'll read it again.  "The declarations

25    or other statements used in the creation and/or manipulation of

1    resources and content in this document may generally be

2    referred to as directives."

3        That's an incredibly broad concept.  When we look at 101,

4    as Your Honor knows, the purpose is are we preempting

5    something, or are we describing, you know, an exact

6    technological invention, an inventive concept, something that

7    is actually technological in nature.

8        When you just say we're going to prohibit the use of all

9    directives in any computer language, in any statement -- and

10   that's what we claim.  We claim any kind of statement that

11   directs you.  No matter whether we've invented it, you come up

12   with it in the future, whether we had conceived of it or not,

13   that is exactly the sort of preemptive idea that you can't grab

14   for yourself.  That's exactly the purpose of the 101 doctrine.

15       Finally, I'll say just that opposing counsel said, "Oh,

16   these can't be performed in the mind.  You know, they can't

17   be."  We looked at the claim.  Which step is it that I can't

18   perform in my mind?  Here's the claim.  I can receive

19   directives.  It doesn't call for receiving the directive

20   electronically.  Even if it did, the electronic receipt of

21   information is insignificant extra-solution activity under the

22   law.

23       Determining whether or more [sic] one of the directives

24   includes a prerequisite directive.  Why can't I do that in my

25   mind?  I can make a determination.  The Court does it every

1    day.  I initiate a presentation.  It doesn't call for any

2    technological way of doing it.  It doesn't call for a

3    programming step.  There's no code here.  Why can't I initiate

4    a presentation -- I have today -- or prohibit initiation of the

5    presentation?  Why is it I can't do that?

6        He says these things can't be done in the mind, we're

7    wrong, we're grossly overgeneralizing the claim.  Where am I

8    doing that?

9            **THE COURT:**  Okay.  Let's go to --

10           **MR. ROBERTS:**  Move on?

11           **THE COURT:**  -- the '691 patent.

12           **MR. ROBERTS:**  Okay.

13           **THE COURT:**  The gathering of user identification

14   information and the method for targeting the programming

15   outside of the user's home.  So --

16           **MR. ROBERTS:**  Great.

17       So here, Your Honor -- I'm going to do this slightly

18   differently.  So here's the claim of the '691 patent, and it

19   has a number of different limitations in it, and what I want to

20   try to do is group the limitations together and talk about what

21   they call for.

22       So first there are a set of limitations that call for

23   receiving information; right?  A, B, and E.  These call for the

24   receipt of a user identification, the receipt of resection site

25   information, the receipt of an updated user profile.  It calls

1    for simply receiving information.  Then it calls for capturing

2    information that has been received.  I get it, and I've got it.

3         Then what I do -- oops.  Sorry.  I must have pressed the

4    button.  Then what I do after I have captured the

5    information -- after I have captured the information, there is

6    a set of processing steps, and those processing steps are

7    updating the user profile, processing the updated user profile,

8    and selecting a targeted program.

9         All three of these things are data processing; right?

10   Updating a user profile.  I can do that with pen and paper.

11   Processing the updated user profile to provide determinations

12   about user actions.  That's something that can be done in the

13   mind.  It's not a specific method of processing.  It's

14   processing in the abstract.  And then selecting a targeted

15   program based upon the data.  A human being, again, could make

16   that selection.

17        This is not a technological invention.  These are steps

18   performed by people.  Then it calls for providing that which

19   has been selected.  Now, as I said at the outset here,

20   post-solution activity or extra-solution activity does not help

21   when we're talking about patentability.

22        I have a couple of quotes here.  This is from *Parker v.*

23   *Flook* at the top.  "The notion that post-solution activity, no

24   matter how conventional or obvious, can transform an

25   unpatentable principle into a patentable process exalts form

1    over substance."  You can attach some form of post-solution

2    activity to almost any mathematical formula.  Doesn't help.

3         *Cyber Corp*, Federal Circuit.  Mere data-gathering steps

4    cannot make an otherwise statutory claim statutory.  If we take

5    out the steps that call for receiving data or providing the

6    data or capturing the data, we're left with only three

7    solution-type activities.

8         Those solution-type activities are what I just went

9    through:  Updating the user profile, processing that updated

10   user profile in order to make a determination, and then making

11   a selection based upon it.  That is the heart -- that is a core

12   abstract idea.  I get data in, I update it, I process it, and I

13   make a selection.  None of this requires a computer.  It

14   doesn't call for doing any of it online in a computer in any

15   way.

16        Let's compare this to *Walker Digital*.  And, again,

17   Your Honor, this is a very similar claim that was recently held

18   invalid.  It also calls for receiving a set of information, the

19   unspecified processing in Step F in order to make a

20   determination, and then exchanging or transmitting the

21   information that's been processed as a result of the

22   processing, not a closed case from Judge Stark.

23        These two patents are essentially claiming the same type

24   of mental manipulation of data in the abstract.  At most, even

25   if the Court concludes that it implies the existence of a

1  computer -- "Oh, because we would assume this processing is

2  happening online, a person of ordinary skill would know that

3  this is online" -- that can't help you because under *Alice* it's

4  either limiting it to a particular technological context or

5  implying the existence of a generic computer; right?  What is

6  more generic than a computer that's not mentioned in the

7  claims?

8          THE COURT:  Mr. Edwards?

9          MR. EDWARDS:  Let me take a step back because here

10  what we've done is we've already jumped down to assuming that

11  this is an abstract idea and then parsing through the claims of

12  whether there's anything inventive.  But in the first step,

13  we're looking at what is the inventive concept.  We're looking

14  at the claims.  We're looking at the patent.

15      Here, again, we're dealing with improvements to the

16  content delivery system.  There was a technical --

17  technological problem.  It wasn't a post-solution addition of

18  "Let's add these other elements."  There was a problem with the

19  technology that was identified.  That problem was then solved

20  through innovations that were described here in the '691.

21  Specifically, the problem that was identified was that these

22  users --

23          THE COURT:  Well --

24          MR. EDWARDS:  -- outside of their home --

25          THE COURT:  -- I mean, you're saying you don't fall by

1    the wayside under the first prong because you're disputing that

2    they say that this is an abstract idea.  But, however, whatever

3    point at which you get to the second step, is this an inventive

4    concept?  How is this -- let's assume for a moment that it

5    isn't an abstract idea.  I'm with you on that.  Where is the

6    inventive -- you're saying they've identified a problem.

7    What's the inventive concept that's suggested for resolving the

8    problem?

9            **MR. EDWARDS:**  That's what we see in the claims.  So

10   here in --

11           **THE COURT:**  What is it?

12           **MR. EDWARDS:**  -- the context --

13           **THE COURT:**  Yes.

14           **MR. EDWARDS:**  -- of a content delivery system where

15   users could not get directed personalized content when they're

16   outside their home.  It was introduced opening up the hood and

17   saying, "What can we add to this system?  Let's add in the

18   ability to be able to personalize the content."

19       So how do we do it?  We looked to see where are these

20   people at.  What is their identification?  Where are they

21   located?  What are they doing?  What are their actions?  In

22   addition to that, not only what are the actions, but what

23   information -- additional information about the actions can we

24   gather?  Taking that, combining it together, and then using

25   inferences and determinations within the system --

1    **THE COURT:**  But isn't it -- is that really saying

2  anything more than "Boy, it would be nice to get more specific

3  information about a lot of these people"?  I mean, isn't that

4  all it is at the end of the day?

5    **MR. EDWARDS:**  No, because it was directed to this

6  content delivery system and used for that purpose of actually

7  improving the system so that the end users were getting content

8  that was directed to them based on both where they were

9  located, their activities, and their existing user profile.

10    **THE COURT:**  Well, again -- I mean, what I'm sort of

11  seeing this play out as is to say the problem, if you will, is

12  we want to be more effective in our communication with the

13  particular constituency that you want to connect with.  And so

14  it would be very useful to obtain much more specific

15  information regarding these people and then be in a position to

16  target to them when they're not in their home specific

17  information that's going to be tailored to them.

18    I mean, that's kind of -- that's kind of what I see you

19  saying.  And yes, I can see why people would want to do that,

20  but I don't see anything particularly creative in that.

21    **MR. EDWARDS:**  So this was specifically in the context

22  of improving the conventional content delivery system.

23    **THE COURT:**  Uh-huh.

24    **MR. EDWARDS:**  And so you're right.  If we start with

25  saying, "Well, this is just abstract," then we've got to then

1    go to the second step to start to pull out what are these

2    additional elements that are going to be converting the

3    abstract idea.

4         But on the first step under the *Alice* analysis, we're

5    actually looking at is it an abstract idea, or is there an

6    inventive concept?

7         **THE COURT:** Well, aren't you collapsing the two steps

8    here? Your -- I thought your point to me was --

9         **MR. EDWARDS:** I'm sorry.

10        **THE COURT:** -- first we have to decide whether or not

11   it's an abstract idea, and if you determine that it's not -- or

12   if you determine that it is, then it can still be patentable if

13   you bring to it some inventive concept. If it's -- if it's not

14   an abstract idea, then you don't even need to get to Step 2

15   because you can -- it's patentable subject matter; right? Am

16   I -- is that correct?

17        **MR. EDWARDS:** Yes. Let me clarify. I'm sorry. I'm

18   not collapsing the two steps.

19        So on the first step, we have patent-ineligible subject

20   matter, patent-eligible. In the ineligible, we've got laws of

21   nature, natural phenomena --

22        **THE COURT:** And abstract ideas.

23        **MR. EDWARDS:** -- and abstract ideas.

24        **THE COURT:** Right.

25        **MR. EDWARDS:** Outside of that, it's patentable subject

1    matter.

2          THE COURT:  Exactly.  And you're saying we don't even

3    have to get to Step 2 because you think you're outside those

4    three parameters; right?

5          MR. EDWARDS:  That's correct.

6          THE COURT:  Okay.  And -- okay.  We're on the same

7    page.

8          MR. EDWARDS:  And another thing to think about is,

9    well, what guidance has the Court given us to what's outside of

10   it because the Court has given us some guidance.  Inventive

11   concepts are outside of abstract ideas.

12         THE COURT:  No.  I think -- I think they're saying the

13   way to get within patent protection is even if it's an abstract

14   idea, if you brought something -- if you brought some creative

15   concept to it, some inventive concept, then perhaps it's still

16   subject to being patentable even if it's in the realm in the

17   first instance of an abstract idea.

18      Now, maybe I'm wrong, but that's how -- I think that's

19   favorable to the patent-holder generally, that two-step

20   approach.  Now, maybe I'm wrong about that, but that's kind of

21   not going in the direction that I wanted to direct you.  This

22   is certainly not a term of -- patent term of art, but I've used

23   it before.

24      It's -- if your -- if I conclude that your patent is

25   nothing more than an aspirational goal, it's saying, "Boy, it

1    would be nice if we can do this, target information to a

2    particular group of people," that's not patentable, is it?

3            **MR. EDWARDS:**  I would agree with you.

4            **THE COURT:**  Okay.  So you have to be able to say this

5    is the problem, and this is the solution; right?

6            **MR. EDWARDS:**  Yes, Your Honor.

7            **THE COURT:**  Okay.  What is -- and we're focused right

8    now on the '691 patent.  What is the solution?  Where does it

9    lay out the solution?

10           **MR. EDWARDS:**  So the solution is what we see laid out

11   in the claims.

12           **THE COURT:**  Yes.

13           **MR. EDWARDS:**  So the problem we see in the spec

14   describing the conventional content delivery systems --

15           **THE COURT:**  Okay.

16           **MR. EDWARDS:**  -- technological problem.  The spec also

17   describes a solution that's claimed as the specific description

18   of a solution.  That's described in the specification.  Here --

19           **THE COURT:**  And the solution is get information about

20   these people and be able to use it in an effective manner to

21   communicate with them when they're outside their home?

22           **MR. EDWARDS:**  Gathering specific information used by

23   the content delivery system -- user identification, locations,

24   actions -- taking that information, also gathering additional

25   information that was -- from what was gathered.

1        What about the actions?  What was the action -- particular

2   action being performed?  It's not just gassing up but gassing

3   up with, you know, Supreme Unleaded, taking that information

4   and then synthesizing it, updating the user profiles.  User

5   profiles are content delivery -- specific concrete

6   implementation in content delivery systems, updating the user

7   profile and then processing all of that information to

8   determine what targeted programs should be directed to these

9   users when outside the home.

10        All -- I mean, all of these are concrete changes to a

11   content delivery system.  I think on that first -- the first

12   step within *Alice*, we have to look at the patent as a whole and

13   how do the claims fit into it.  It's a question of is it -- is

14   there a technological problem?  Is there -- is there a

15   technological solution?

16        Another concern that *Alice* is looking at is preemption.

17   Now, I understand that there's arguments that these claims

18   apply to all these different ideas.  Well, that's not true.  No

19   one would argue that this claim is directed at how -- you know,

20   how we interact with the Court today, you know, gathering more

21   information, watching me speak here, located right here in San

22   Francisco, mental steps of "All right.  What should I say to

23   him now?"

24        That's not what the claim's directed at.  It's directed at

25   specifically user profiles, specific information about these

```
 1    users in the content system.

 2         THE COURT:  So the inventive concept in part -- and

 3    I'm not suggesting this is the entire landscape here, but just

 4    to use your example, identification information that might be

 5    contained in the credit card that's used at a gas station.  Are

 6    you saying that that's -- that is sort of an example of -- of

 7    creative patentable concept?

 8         "Oh, you know, our patent suggests that you can" -- "you

 9    can glean personal information that will be useful to you in

10    communicating with a particular user by tapping into the well

11    of information that may be contained on their gas credit card,

12    which they then use at a gas station."  You're saying that's

13    what's -- is that an aspect of --

14         MR. EDWARDS:  That's an --

15         THE COURT:  -- what you think is protected?

16         MR. EDWARDS:  -- aspect of the inventive concept, but

17    it's only one element within the claim.

18         THE COURT:  I understand.

19         MR. EDWARDS:  It's the claim that describes the

20    inventive concept.

21         THE COURT:  Okay.

22         MR. ROBERTS:  So let me respond.

23         THE COURT:  Why is that not an inventive concept that

24    takes out -- even assuming that you're -- you know, you're

25    right, it's an otherwise nonpatentable abstract idea, but
```

1  they've added in an inventive concept to it --

2       **MR. ROBERTS:**  And the inventive concept is what?

3       **THE COURT:**  Going -- taking your -- gleaning

4  information that's utilized by virtue of a credit card in a gas

5  station.

6       **MR. ROBERTS:**  Okay.

7       A.  That's not claimed here.  That's way more specific

8  than anything that's claimed here; and

9       B.  That's completely conventional.

10      **THE COURT:**  Well, isn't it an example that's used in

11  the -- I think it's used somewhere in the specification if I --

12      **MR. ROBERTS:**  Sure.

13      And examples in the specification is, as *Accenture* says,

14  not relevant.  The question is what's in the claims.  Let's

15  look at the claim.  Where is --

16      **THE COURT:**  Yeah, but the specification can illustrate

17  the claims.  I know it can't operate as a claim limitation, but

18  it can illustrate and make the claims understandable.

19      **MR. ROBERTS:**  Sure.

20      And it's perhaps one of the many types of

21  information-gathering that would fall within this claim.  And

22  if we're concerned about preemption, it's the fact that it's

23  any type of information-gathering, including a credit card or a

24  bar code or your name or I watched that you cheered at a

25  football match.  It's not limited to any of those things, and

 1   it's -- therefore, it's preemptive; right?

 2        That -- when the Supreme Court uses -- in *Alice* uses the

 3   term "inventive concept" in the second step of *Alice*, it

 4   doesn't really mean a novel idea.  If you look at the context

 5   in which it's reciting that, it says an inventive concept

 6   sufficient to ensure that the patent is substantially more than

 7   a drafting attempt to claim the monopolized abstract idea

 8   itself.  It can't be simply another abstract idea.  It's got to

 9   be something specific -- substantially more to transform, they

10   say, the nature of the claim.

11        Gathering data from a credit card, generic activity,

12   conventional steps -- none of that is an inventive element, an

13   element of human ingenuity that transforms it into something

14   substantially different from an effort to monopolize the

15   abstract idea.

16             **THE COURT:**  Okay.

17             **MR. ROBERTS:**  Two more points, Your Honor.

18        First, Your Honor has it right that the inventive concept

19   analysis is in the second step.  The first step is is this

20   directed to an abstract idea?  As I mentioned earlier, the way

21   *Alice* says it's directed to an abstract idea in some of the

22   cases that they look at sort of historically.

23        And Your Honor has said, "Well, I don't know how helpful I

24   find that."  Judge Pfaelzer has given an alternative sort of

25   articulation of this, and what she said is when we're looking

1    at whether or not something is an abstract idea, we look to the

2    purpose.   What is the purpose of this stated at a relatively

3    high level of generality?   What's the purpose of the claim?

4         Here, the purpose of the claim is, just as Your Honor has

5    said, we're going to gather information.   We're going to allow

6    us to make better decisions about information; right?   It's

7    equally applicable to direct mail.   It's equally applicable to

8    a large number of other types of systems.   The purpose is an

9    abstract idea; right?

10        When you look at the Supreme Court case in *Alice* --

11   right? -- that was a computerized system, and they say the

12   purpose here is for hedging risk or the purpose here is an

13   intermediary for exchange.   The purpose here is for gathering

14   additional information to make better decisions; right?   That's

15   an abstract idea.

16        Once we move past that into Step 2, the question is:   What

17   is it in the claim that adds substantially more than that that

18   narrows this so that the preemption concern is substantially

19   mitigated?   And I don't see anything in the claim.   There isn't

20   any specific technology.   There isn't a specific machine.

21   There isn't a specific computer.   There's no specific

22   programming.   There's no specific coding.   There's no specific

23   anything.   Instead, it says things like "We're going to

24   process."

25        Now, opposing counsel said, "Oh, it's the user profile";

right?  But, I mean, a user profile is a set of data.  I mean,

he hasn't suggested even under any claim construction how a

user profile is anything other than a set of information about

a user; right?  It doesn't matter what precisely the metes and

bounds of the user profile are.

      **THE COURT:**  There's no aha moment here that "Ah,

that's the way we're going" --

      **MR. ROBERTS:**  "That's the way we're going to do it,"

right.  So what is it about it?

    The other thing I would point out, Your Honor, is that the

inventiveness here, the inventiveness of the abstract idea, is

not relevant.  So for example, we have from *Diamond v. Diehr*

the novelty of any element or step in the process or even the

process of itself is of no relevance in determining whether the

subject matter of a claim falls within 101.

    In *McRO*, he looked at a number of cases and said, quote,

"The revolutionary nature of an abstract idea does not weigh in

favor of patentability."  In *Myriad* -- right?  In *Myriad*, they

found it unpatentable.  No one was disputing that Myriad --

they hadn't discovered the BRCA1 gene.  That was an incredibly

novel, interesting thing.

    When Einstein came up with E equals MC squared, it was

completely novel at that point.  All sorts of wonderful

benefits flowed from it.  It's still abstract.  It hasn't

gotten less abstract over time because it's become known for a

```
 1    longer period of time.  Abstraction and novelty are

 2    independent.

 3         And when the Court talks about an inventive concept, what

 4    it means is it means something that changes this, that

 5    transforms the nature of the claims so we don't have to worry

 6    about precluding other people, so we don't have to worry about

 7    the balance of preemptions so much.  And I don't see anything,

 8    for example, in Claim 1 that would even begin to mitigate that

 9    claim.

10         What is it, updating a user profile; right?  Any way you

11    update it, we're not going to tell you how to do it.  We're not

12    going to tell you what information to add.  You update a user

13    profile.  We own it, process the data, select it, make a

14    selection, any rule, any type of selection that you do.  These

15    are incredibly broad concepts, which is why I walked through

16    them and said I can do them all in my head.  These are all

17    things that are done by people all the time.

18         That's not dispositive, but that's a strong indication

19    that these are broadly preemptive.  If they preempt even human

20    action -- right? -- it's not limited to a particular

21    technological development.  Then he says, "No.  No.  Don't

22    worry about that.  We're improving a content delivery system,

23    conventional content delivery system."

24         Two things.  First, I read that as a concession that

25    content delivery systems are conventional; right?  So now we
```

1   have to identify a specific improvement.  It's not enough now

2   to say, "Oh, it's limited to a content delivery system."  It

3   wouldn't be anyway even if you hadn't made that because that

4   would simply be limiting it to a particular technological

5   context.

6       But especially now that opposing counsel has conceded that

7   content delivery systems were conventional and this was in

8   addition to them, we now have to look for something that is in

9   addition to a content delivery system that is not a

10  conventional computing capability, and there is literally

11  nothing of that kind in the claim.

12          THE COURT:  Let's talk now about the '268 patent, and

13  then I want to move on to the case management conference --

14          MR. EDWARDS:  If I may, Your Honor --

15          THE COURT:  -- part of the discussion.

16      Oh.  Go ahead.

17          MR. EDWARDS:  Briefly, two points.

18      First is we're not arguing that what the patent that --

19  we're not arguing that novelty is what takes a claim outside of

20  the realm of patent-eligible and patent-ineligible.  It's not

21  an issue of novelty.  It's an issue of inventive concept.  And

22  here, when we start with the framework that's laid out in the

23  patent that this is directed to a content delivery system, it's

24  how do we improve it.

25      Nobody would disagree that taking a hammer and changing it

1    could be patentable.  We're not taking the content delivery

2    system that existed in the past and saying, "Let's use it in a

3    conventional way, but let's change it in an unconventional

4    way."  We're actually adding new technology to it.  This was

5    not -- what the patent was addressing was something that other

6    content delivery systems didn't have a solution for.  It wasn't

7    the conventional way that these content delivery systems were

8    being used.

9              **THE COURT:**  Okay.  Let's talk about the '268 patent.

10             **MR. ROBERTS:**  Thank you, Your Honor.

11        So the '268 patent calls for a method of scheduling

12   delivery of multiple items of content selectively to a

13   plurality of users.  That's actually a pretty fair statement

14   about the purpose.  This is a patent about scheduling delivery

15   of items to people.  That's exactly what it says it is, and it

16   has only three limitations in the exemplary claim.

17        You determine expected values relating to each user being

18   online to access information over the Internet during any given

19   time period.  You generate an ordered list or what they have

20   called a master list of the items of content to be delivered,

21   and then you generate individual lists of items of content to

22   be delivered to each user dynamically for each user when they

23   log in.

24        Okay.  So what are we actually talking about here?

25   Imagine I have a number of items of content that I need to

1    deliver.  Let's call them advertisements.  Here, I have a GEICO

2    ad, Cheerios ad, and Colgate ad, and I have a certain number of

3    requirements for them.  So the GEICO ad needs to be delivered

4    to two people tonight, the Cheerios only needs to be delivered

5    to one, but it's got to be a child, and the Colgate ad needs to

6    be delivered to a person -- to one person.

7         Now, the claim calls for determining expected values

8    relating to each user being online to access the information

9    over the Internet during a given time period.  Here, I've done

10   that.  The given time period is tonight, and I have myself

11   determined for three hypothetical people expected values

12   relating to the probability of people being online, a hundred

13   percent, 50 percent, and 50 percent.

14        John is an adult.  Mary is a child.  Stuart is an adult.

15   I have made that determination; right?  It doesn't call for a

16   specific technological way of doing it.  It doesn't call for

17   programming.  It doesn't tell you how to do it.  It just says

18   you make the determination.

19        Next, I have to generate an ordered list.  Well,

20   generating a list, Your Honor, is, again, fundamental human

21   activity.  It is an abstract idea, and I use the information

22   that I have to generate the list.

23        Now, I'm going to walk you through the specifics about how

24   it is, but my actual point is it doesn't matter.  Generating a

25   list based on data is an abstract idea, no matter the

1    intricacies of the data you're using to generate it, and this

2    doesn't give you a particular way of generating it.  It just

3    says you generate it to be selectively delivered based on not a

4    particular formula.

5        It doesn't give you weighting.  It doesn't give you an

6    algorithm.  It doesn't give you a specific way of doing it or a

7    priority of doing it.  It just says you generate a list based

8    on this data.  That's an abstract idea.  The particular

9    abstract idea so the Court can understand it is that you

10   generate the ordered list of items based upon the expected

11   values in the previous -- the ordered list being prioritized to

12   meet the delivery requirements.

13       So here, for example, I have looked at my expected values,

14   and I said, "What is my rarest commodity?"  It's Mary, the

15   child.  I only have one of them, and there's only a 50-percent

16   chance she's going to be online at all tonight.  So I am going

17   to prioritize the Cheerios first.

18       What's my second rarest commodity?  Well, it's GEICO

19   because GEICO needs to go to two different people, and there's

20   a hundred-percent chance of John but only a 75-percent chance

21   that Mary or Stuart will be on.  So that is my second

22   commodity, and then the third one is Colgate because I can kind

23   of give it to anybody.

24       So I have now generated an ordered list -- one, two,

25   three -- in terms of the likelihood of meeting the delivery

1   requirements based on the expected values.  I use them in

2   making the list, and the list is prioritized in order to meet

3   the delivery requirements associated with the items of content.

4        So now what do I do?  Well, I generate an individual list

5   of items of content to be delivered to each user based on that

6   ordered list wherein the individual list is dynamically

7   generated.  And, again, regardless of the specifics of what the

8   particular manipulations is calling for, this is calling for

9   generating a list based on data.  That's an abstract idea, no

10  matter what the data is.  And in particular, it says you do it

11  based on user log-in.

12       Now, if the user logs in and then calls me, I'm still

13  meeting the claim.  It doesn't say I use the user log-in, but

14  even if it did, that would just be an input to the decision.

15  That's extra-solution activity.  That's triggering it.

16       So what do I do?  At 8:00 o'clock, Mary logs in.  I use

17  the original list, and I generate a specific list for her.

18  Hey, child.  That's my Number 1 priority.  Give her the

19  Cheerios.  GEICO, that's my Number 2 priority.  Give her the

20  GEICO.

21       At another time, upon user log-in, John logs in.  What do

22  I do?  I use my original list, and I generate a list for him, a

23  dynamically generated list for him using GEICO and Colgate

24  because now GEICO is the top priority because Cheerios has

25  already been served, and Colgate is my next priority.

1          That's actually what the claim is calling for.  But,

2    again, the specifics of the data manipulation don't matter to

3    the analysis.  The point is that we're calling for fundamental

4    activity of getting data and generating lists.

5          Here's *Digitech*.  *Digitech* was a method of generating a

6    device profile.  You generated first data for describing a

7    device using independent color space through the use of

8    measured chromatic stimuli in device response characteristic

9    functions, pretty complicated.  Then I generated second data,

10   and I combined the first and the second data -- right? -- and

11   not patentable.  And what *Digitech* shows in particular is that

12   the idea of taking information, using it to generate lists, and

13   then creating some sort of combined data set from them really

14   doesn't help you at all.

15         Now, two other cases I'll cite for Your Honor here.  In

16   *Tuxis Tech v. Amazon*, which is 2014 D. Delaware 4382446,

17   September 3rd, 2014, at 4, it was specifically looking at a

18   patent directed to doing the same thing in realtime, quote,

19   "basing its upsell recommendation on novelty combinations of

20   novel accommodations of data, namely the identity of goods or

21   service of the primary transaction and the second data element

22   related to the user.  The whole transaction is performed in

23   realtime using an electronic communications device."

24         But the Court found that none of the limitations recited

25   by *Tuxis* are meaningful, doing it in realtime, using the

1    communication device, or just manipulating data.

2         *DietGoal Innovations*, 2014 West Law 3582914 -- I feel like

3    saying, "Hut, hut, hike" -- at 13.  Quote, "Steps 1 and 2

4    involve creating customized lists by retrieving information

5    from a stored database, one of the most basic functions of a

6    general computer.  Step 3 likewise amounts to conventional

7    computer tasks, manipulating data based on inputs from the

8    user, making computations from stored data, and displaying the

9    results on a visual display."

10        That is a perfect description of this case.  This case

11   falls squarely within the post-*Alice* precedence.  It's claiming

12   abstract ideas.  There's nothing patentable here.

13        **THE COURT:**  Okay.  Mr. Edwards, on the '268 patent?

14        **MR. EDWARDS:**  Yes.

15        Here, first, again, where we need to start is with the

16   patent.  What was the problem?  What was the solution?  Here,

17   we see a technological problem in these conventional content

18   delivery systems.  Specifically, the existing content delivery

19   systems -- they didn't have the ability to specify factors that

20   were specific to an individual and schedule that content

21   delivery for that specific individual while still meeting the

22   priorities of the entire content delivery system itself.

23        What was the solution that the engineers came up with?  It

24   was the use of what we see in the claims, use of determining

25   expected values; that is, user behavior on -- online with this

1    content delivery system.

2          You know, the analogy here that Counsel has provided

3    doesn't apply here.  We're not talking about somebody standing

4    over Mary's shoulder and seeing "Oh, you're now logged in.  How

5    long are you going to be on?"  But it's actually the content

6    delivery system itself is being modified to recognize and be

7    able to implement forecasting of individual users' behavior.

8          And then the additional modification is to take these

9    master lists, which is essentially the priority that the system

10   needs to meet for the content, and generating then an

11   individual content delivery list.  How -- for this individual

12   person when they log on.  It's when they log in and they become

13   available for the content.  This is not someone standing over

14   their shoulder and watching this happen, but this is through

15   the system itself.

16         And these are all improvements, changes making the

17   conventional systems better and more efficient so that users

18   will be able to get content but also be able -- the system can

19   meet its priority demands.

20         That's what we see in each of the steps of the claim, the

21   description of that solution of generating expected values,

22   generating the lists, being able to then generate an individual

23   list dynamically, generated and then provided to the user on

24   user log-in specific to these content delivery systems.

25         What we're not arguing is this is merely novel or that

1    we're taking ideas and saying, "Do it in a computer," but

2    you're actually starting with the content delivery system

3    itself, seeing a problem, opening the hood, changing it,

4    improving it, making it better.  And that's the inventive

5    concept.

6            THE COURT:  Okay.  Let's now transition to the case

7    management part of our discussion.  This is actually our first

8    case management conference in this matter.  Let's -- let's go

9    to the scheduling question first, and there's a difference of

10   opinion, as I understand it.

11       The Netflix side effectively is saying, if I'm reading

12   this correctly, Number 1, you need to get your determination on

13   these pending motions, and we've got activity in the PTAB, and

14   we need to await that before we do anything else in terms of

15   scheduling and the like.

16       Is that fair?

17           MS. DURIE:  That is largely fair with a slight gloss.

18   We have -- so we have 11 patents total.  Three patents there

19   are already IPR's that have been instituted, and we would say

20   under any circumstances those three patents should be stayed

21   pending a determination on those instituted IPR's.

22           THE COURT:  Is that a mandatory stay or a

23   discretionary stay?

24           MS. DURIE:  That's an interesting question.  I do

25   think the Court has some level -- some level of discretion, but

1    I think it is highly constrained.  And I think there is, at a

2    minimum, a very strong presumption that the Court should stay

3    proceedings with respect to at least those three patents

4    pending that determination.

5        That's the reason the IPR process was put in place

6    essentially, which is to forestall the need for litigation,

7    provide an efficient mechanism for the resolution of the

8    validity issues.  So that takes care of three of the patents.

9    We have the pending summary judgment motions with respect to

10   three patents.  That leaves us with five.

11       There has been an informal standstill in place, which is

12   why we have requested the Court to push back this hearing.  But

13   as we said in the case management conference statement, it is

14   our expectation that within sort of roughly 60 days, we do plan

15   to institute further proceedings in the Patent Office not with

16   respect to all of the remaining patents but with respect to

17   more than one of them.

18       It's our view that, under any scenario, what makes sense

19   is for us to get back together probably at the end of January

20   and see where we are at that point in time.  And then I think

21   the question for the Court is:  Does it make sense for us to

22   sort of gear up and start the discovery contention process now,

23   or does it make more sense for us to wait 60 days?

24       I understand the case has been pending a long time.  There

25   were transfer proceedings in Delaware that took a while.  Then

1    the case got transferred here.  OpenTV added four additional

2    patents into the case after it was transferred here, and then

3    the parties, by agreement, have asked to push off proceedings.

4         So although I realize it looks like the case has been

5    around for a long time, nothing has actually happened, and

6    that's not because of lack of diligence from the parties.

7    That's just because of the way things have shaped up.

8              **THE COURT:**  I suppose one question I have is -- to

9    fess up, I haven't, you know, immersed myself in these -- in

10   all the patents at issue in this case.  But of the five that

11   are untouched, if you will, by the pending motion --

12             **MS. DURIE:**  Yes.

13             **THE COURT:**  -- and the activities, both current and

14   anticipated, in the patent and trademark world back in

15   Washington -- or here, I guess, now.  You can do it here;

16   right?

17        Are the five -- are they discrete in the sense -- you

18   know, the obvious question that arises in my mind is:  Can we

19   make some progress on the five that are, under any scenario,

20   not going to be affected by these decisions such that you're

21   not, you know, reinventing the wheel, depending upon then what

22   happens with the remaining six?  And if the answer to that

23   question is yes, there's no reason to wait because you can --

24   you know, you can make some progress.

25        If the answer is, you know, everyone is going to have

1   to -- we're going to have to redepose everybody and all of this

2   stuff, then maybe it's a different question, but what I'm not

3   clear on is which way that falls.

4          **MS. DURIE:**  So there is substantial overlap in subject

5   matter with respect to the patents that are in IPR and the

6   remaining patents in terms of -- at least at a high level in

7   terms of what it is that OpenTV appears to be accusing.

8          Now, I said that in a very conditional way because we

9   don't have infringement contentions.  I'm going off a

10  complaint, and as Your Honor knows, that's a very generalized

11  document.  They're not in the same -- so there are two patents

12  that are in the same family, but essentially these patents are

13  all in different families.  So it's not a situation where we're

14  looking at sort of a close familial relationship.

15         It is our sense that we are looking at substantial overlap

16  in terms of what's being accused, but -- I mean, frankly, I

17  can't make a strong representation to the Court on that because

18  at this juncture it's not entirely clear what specific features

19  are being accused.

20         **THE COURT:**  Well, your suggestion is in two parts.

21  One is my activity in terms of the pending motions, and the

22  other is what's out of my hands.

23         So at the very least, I read your suggestion -- your

24  suggestion to go to January for a case management -- further

25  case management is not necessarily asking me to call the

1  question of whether or not I have to wait for all of the other

2  tribunals to weigh in and do whatever they're going to do.

3      So that's kind of the initial position because to call

4  that question -- to essentially throw myself in the position of

5  saying, "I'm going to wait for others to make all the calls

6  they're going to make in this matter that may lead all the way

7  up to the Federal Circuit and back" is a tall order at this

8  stage of the game.

9          MS. DURIE:  Understood, and that's why we're not

10  making that request at this stage.  I mean, our request at this

11  stage is not for the Court --

12          THE COURT:  Okay.

13          MS. DURIE:  -- to stay the case indefinitely pending

14  final resolution of the pending IPR's, but once we get the

15  Court's ruling on the pending motions and once -- as I said, we

16  intend to seek review with respect to additional patents.  I

17  think we may have some more clarity on what the scope of the

18  case is.

19          THE COURT:  Okay.

20          MS. DURIE:  That's our -- that's our initial position.

21  Suffice it to say, we don't agree that it makes sense to start

22  with damages discovery, but I won't belabor that point unless

23  the Court wants to hear argument on that.

24          THE COURT:  Well -- and I understand that is the

25  position that OpenTV has set forth, but there's a preliminary

1  question in my mind, and that is just is this the point in time

2  when we do -- when I start making those calls?

3       And it does seem to me that at the very least a -- you

4  know, a short continuance, if you will, or bumping over of the

5  case management conference to just get some -- it appears that

6  we're going to get some additional information in part because

7  I'm in control of some of the additional information you're

8  going to get, and that is this pending motion.  Doesn't it make

9  sense -- we're not going to have complete clarity about which

10 issues are going to be litigated in this court ultimately and

11 which aren't, but we're going to know a lot more, and that's

12 not that much of a delay.

13      So if I -- if I put you over for a CMC in January or

14 February, you're not losing all that much ground on the

15 assumption that I can get my order out in the meantime -- and

16 even that, I'm not entirely sure I can promise you, but -- so

17 back to you --

18           MR. EDWARDS:  Yes, Your Honor.

19           THE COURT:  -- why not that?

20           MR. EDWARDS:  So let me address -- let me address an

21 initial point; that is, the stay.  Is it discretionary?  Is it

22 mandatory?  You haven't -- the Court has inherent power to

23 manage its docket even in the case of IPR's.  It's not

24 mandatory.

25           THE COURT:  Well, the reason I asked the question is

1    there are some stays which, as I understand it, are mandatory.

2    And I don't recall as I sit here now, but isn't that right?  I

3    thought there was some -- some instances where I really don't

4    have discretion, and then there are other instances where I do,

5    and I can't recall off the top of my head.

6         **MS. DURIE:**  Your Honor, I just -- in the case of

7    covered business method review, there is no discretion.

8         **THE COURT:**  Okay.

9         **MS. DURIE:**  There, I believe the stay is mandatory.

10   In the case of an IPR, it's not our position --

11        **THE COURT:**  Okay.

12        **MS. DURIE:**  -- that the Court has no discretion,

13   although, as I said --

14        **THE COURT:**  You're saying --

15        **MS. DURIE:**  -- I think the Court's discretion is very

16   cabined.

17        **THE COURT:**  Okay.  Fair enough.

18        So in this instance, everybody agrees there's some element

19   of discretion to my -- the call I'm going to make.  So -- okay.

20        **MR. EDWARDS:**  Yes, Your Honor, and I believe it's

21   actually -- it is your discretion.

22        **THE COURT:**  Okay.

23        **MR. EDWARDS:**  Now, with respect to some additional

24   facts, would it make sense to stay the case?  Here, there are

25   many facts that mitigate against that.

1      **THE COURT:**  Let's not talk about staying the case.

2  Let's talk about my more limited question, which is:  At the

3  very least, doesn't it make sense -- there's no stay involved

4  here.  It's just a pause for 60 to 90 days so I can get more

5  information before I start making calls like is this stayed or

6  are we going to go forward.

7      I mean, that doesn't seem to me to be -- that seems to me

8  to make some sense because in the interim hopefully I'll get my

9  order out, we'll know where we stand with respect to three of

10  these patents, and we will at least know what the lay of the

11  land is on which patents are going to be touched by proceedings

12  in other tribunals.  We'll know all that, which right now we

13  don't entirely know.  And then perhaps I'll be in a better

14  position to make the big calls, which are do I stay this

15  proceeding in whole or in part, or do I barrel ahead.

16      But I guess -- well, let me first ask you:  Do you have a

17  problem with the notion that we just go over in terms of case

18  management issues until the beginning of the year?

19      **MR. EDWARDS:**  Your Honor, if I may just reiterate just

20  to make sure I understand.  The proposal here is that -- you're

21  proposing is to stay discovery --

22      **THE COURT:**  Well --

23      **MR. EDWARDS:**  -- or just not schedule anything?

24      **THE COURT:**  -- I would be inclined to say that there

25  should be a standdown until my next case management conference,

1    but that's not a formal stay of discovery.  That's just let's

2    get some more information before I implement the schedule that

3    then will allow discovery to start up, but it's not really a

4    stay.

5        I mean, it's a semantic difference, I suppose.  But, you

6    know, we're now in the position where we're in mid-November.

7    We're going into the holidays.  I doubt there's going to be an

8    enormous amount of discovery during the month of December.  And

9    then if I see you all again in, say, late January, early

10   February, I'm hoping I will have my order out with respect to

11   these motions, and we'll know some other things, and then we'll

12   start barreling ahead.

13       I mean, is that setting you back that much, or did you

14   have a plan to institute some aggressive discovery plan in the

15   months of January and -- or December and January?

16           MR. EDWARDS:  Well, certainly, the plan is to proceed

17   with discovery.

18           THE COURT:  Okay.

19           MR. EDWARDS:  The case has been pending for almost two

20   years.

21           THE COURT:  Yeah.  In fairness, though, just as

22   Ms. Durie has suggested, I haven't had the case for two years.

23           MR. EDWARDS:  I understand, Your Honor.

24           THE COURT:  But that's just -- that's just, you know,

25   self-protection to make sure the record is clear.  This is a

 1    2014 case from my perspective, but okay.

 2            **MR. EDWARDS:**  Yes, Your Honor.

 3        The parties have already served initial discovery requests

 4    today.  The parties have been serving their responses.  We're

 5    in receipt -- we'll have production.  Discovery is already

 6    starting now.

 7            **THE COURT:**  Well -- and do you have any problem with

 8    completing what's pending?

 9            **MS. DURIE:**  Well, we're serving responses.

10            **THE COURT:**  Yeah.

11            **MS. DURIE:**  Then the question is:  What are we going

12    to go search for?  And as you can imagine, doing a document

13    collection from -- Netflix is a large company.  That's going to

14    be a really burdensome exercise, and we think before doing that

15    it makes sense to figure out which patents are going to be in

16    play and, therefore --

17            **THE COURT:**  Well --

18            **MS. DURIE:**  -- what it is --

19            **THE COURT:**  -- that makes a lot of sense in -- just as

20    you've said it, but then that does get to the -- perhaps the

21    more drilling-down question, which is you've sort of noted that

22    there will be at least five patents that are going to be at

23    play in this court.  You may want me to stay it pending the

24    other proceedings, but isn't the discovery going to be somewhat

25    similar regardless of how many of the patents end up being

1   alive and kicking in this court?

2          **MS. DURIE:**  Two points, Your Honor.

3       First, it's not clear that there will be five patents

4   moving forward.  It is our intent to file additional

5   proceedings in the Patent Office with respect to some of those

6   five patents.  And if the Court sets a further CMC on the

7   schedule the Court is discussing, I think we will have been

8   able to do that, yeah.

9          **THE COURT:**  Oh.  I thought the five were -- even

10  assuming you -- that you institute proceedings with respect to

11  some of the other 11 patents, I thought you were suggesting

12  five were going to remain in place.

13         **MS. DURIE:**  Right now, there are five.  So there's

14  three that are already in IPR.  There's three that are subject

15  to the pending motion.  That leaves five.  We intend to

16  institute proceedings with respect to some of those five, and

17  we would be in a position to have done that by the time we're

18  back in front of Your Honor.

19      So our hope is that it's not going to be five at that

20  point.  It's going to be a smaller number.  Your Honor's ruling

21  on the pending motions may have implications for some of the

22  other patents as well, and -- but I think a document collection

23  with respect to -- let's say there's two or three patents left.

24  Even if Your Honor decides not to stay the whole thing, it's a

25  very different enterprise from the document collection with

 1   respect to --

 2            **THE COURT:**  Yeah.  You know, I'm going to cut through

 3   this to say I think it makes some sense to have a better handle

 4   on at least to the extent -- it won't be entirely clear, but

 5   we'll have some idea of the scope of this by virtue of the

 6   ruling I'm going to give and apparently some update on what the

 7   Netflix side is intending to do.

 8        And I recognize the case has been pending a while.  I

 9   recognize OpenTV wants to move along, but I don't think it is

10   really prejudicial to you to say I'm not going to start the --

11   I'm not going to open the gates -- the litigation gates in the

12   case until perhaps January/February and adopt one of the

13   schedules that -- or a compromise between the two that are

14   suggested by the parties.

15        I think it would be helpful to get some distillation of

16   what we've got to confront.  And then also, without prejudice

17   to the idea I'll consider that -- I'm not indicating one way or

18   the other if I'm inclined to stay or not stay, and I'm also not

19   necessarily going to weigh in at this point on the idea that it

20   should be front-loaded with damages.

21        I have to say I'm somewhat skeptical of that.  I have to

22   tell you just out of the box that I am not entirely of the view

23   that -- that that makes a lot of sense, but I'm not precluding

24   that.  I'll listen to that, but I think at this point what I

25   ought to do is set this for a further CMC and in the meantime

```
1   not start the process by virtue of setting a schedule which

2   involves then exchanging contentions and the like.

3           MS. DURIE:  Thank you.

4           THE COURT:  So I'm going to do that.

5       Let me touch base before we set the actual date for the

6   further CMC.

7       ADR.  You've told me that there's been -- there have been

8   some discussions, as I understand it, without knowing what they

9   are, and I'm not entitled to know.  It looked like there wasn't

10  anything going on right now, but there's some discussion about

11  identifying somebody to be your ADR-neutral.  Is that still

12  going on?

13          MS. DURIE:  I think that's fair, Your Honor.

14          THE COURT:  Okay.

15          MS. DURIE:  And I think -- I think I can say that

16  these are sophisticated parties, and I think -- I think things

17  on that front are in hand.

18          THE COURT:  Okay.  So I should -- that's a nice way of

19  saying, "Just get out of our way," and that's perfectly fine

20  for the moment.  I'm willing to do that.

21      So if I was to pick a date to get back together with you

22  perhaps towards the end of January -- although I know I'm away

23  in that last week in January.

24          MS. DURIE:  Your Honor, may I step away to get my

25  calendar?
```

1         **THE COURT:**  Yes.

2         **MS. DURIE:**  Thank you.

3         **THE COURT:**  The -- I have a problem in the last week

4    in January.  How about the first week in February?

5         **THE CLERK:**  February 5th.

6         **THE COURT:**  Pardon me?

7         **THE CLERK:**  February 5th.

8         **THE COURT:**  February 5th.

9         How about February 5th for the CMC?  And at that point in

10   time, I'm anticipating that I will set a schedule, and I will

11   consider, you know -- in the interim, Ms. Durie, I don't know

12   if you're going to file a formal motion to stay or what -- what

13   you are planning to do.  I think it probably would make

14   sense --

15        **MS. DURIE:**  Right.

16        **THE COURT:**  -- because doing it at the CMC is a bit

17   more informal than -- than you're entitled to have it done.  So

18   I would actually want a formal motion.

19        **MS. DURIE:**  Understood, Your Honor.

20        **THE COURT:**  And what we could do is if there is a

21   formal motion, I could then do the CMC in conjunction with any

22   motion like we did the CMC today --

23        **MS. DURIE:**  Okay.

24        **THE COURT:**  -- and that might make sense.

25        **MS. DURIE:**  I understand.

1   Thank you.

2       **THE COURT:**  Any -- any further comments?

3       **MR. EDWARDS:**  One additional comment, Your Honor.

4   There was one other dispute that I wanted to address

5   because it highlights some of the issues that I think we are

6   facing in the case, and there's a dispute with respect to the

7   privilege log and when it would be due.

8       Specifically, plaintiffs have proposed a specific date,

9   December 18th, which is 35 days from today, which is the date

10  that our discovery is due, and defendants would propose 60 days

11  following their initial production.  And as I understand

12  today -- is that defendants don't plan on producing any

13  documents.  We requested document -- we served document

14  requests four months ago.  We haven't received anything.  The

15  parties have agreed --

16      **THE COURT:**  Was that in -- was that because the case

17  was underway in a different district than ours?  Because I

18  didn't set any -- you know, usually, you wouldn't be starting

19  it until we had the case management conference and we get

20  things organized.  So that's some other judge's schedule.

21      **MR. EDWARDS:**  I'm sorry.  We served discovery after

22  our 16(f) conference.

23      **THE COURT:**  Okay.

24      **MR. EDWARDS:**  And the parties have agreed to extend

25  the date that it's due until today, and now I understand

 1   that --

 2            THE COURT:  So this is for your initial disclosures?

 3            MS. DURIE:  This was -- this was for some original

 4   written discovery that the parties served.  We agreed to extend

 5   all of the response dates until we had the initial CMC because

 6   we had this issue, and we were going to ask the Court to put

 7   things on pause.

 8            THE COURT:  Right.

 9            MS. DURIE:  My understanding from the Court is that we

10   would wait until we get back together, and I'm agnostic as to

11   whether we serve our written -- I mean, I think it makes sense

12   for us to wait, but the issue is not so much when we serve our

13   written responses.  That's a relatively -- that's more

14   administerial.

15        Trying to serve a privilege log in 35 days from whenever

16   our responses are served, I think, doesn't make any sense.

17   This is going to be an enormous task to produce documents in

18   this case, and obviously we can't produce a privilege log until

19   we gather the documents and review the documents and ascertain

20   which documents are privileged and create a log.

21        That's why we suggested the privilege logs we do -- 60 --

22   any privileged documents pertaining to a particular

23   production -- we produce the logs 60 days after we produce the

24   documents.  That's, I think, relatively typical.  I don't think

25   there's any --

1          THE COURT:  I assume --

2          MS. DURIE:  -- reason the Court needs to resolve this

3     now, to be clear.

4          THE COURT:  I assume your request is based on the

5     notion that -- if, for example, there are -- these three

6     patents are no longer in the case, then that would affect which

7     documents ultimately potentially might be relevant but

8     otherwise privileged, which would --

9          MS. DURIE:  Correct.

10         THE COURT:  -- have the normal log.

11         MS. DURIE:  Exactly.

12         THE COURT:  Okay.  Okay.  Well, it seems to me that

13    makes sense.  I don't understand why you would have -- I mean,

14    the whole notion of having a brief standdown so that you get

15    the -- get the input of my order and we find out a little bit

16    more about what's going to be going on in the world of other

17    tribunals -- I mean, that's because there are going to

18    potentially be certain things that aren't at play anymore.

19       So why would we have a privilege log that would cover

20    things that ultimately aren't even going to be in the case

21    anymore?

22         MR. EDWARDS:  What we're dealing with here are

23    patents -- 11 patents.

24         THE COURT:  Right.

25         MR. EDWARDS:  There's overlapping technology.  There's

1   overlapping inventors.  Specifically, at this point, there are

2   only three patents in IPR.  There's four more that are not even

3   eligible for IPR.  One was rejected.  They filed for an IPR,

4   and the Patent Office declined to institute.  Three more have

5   already -- the period to file an IPR has expired.  At least

6   those four patents, they can't move for an IPR at all.

7        The case is going to need to move forward.  There's going

8   to be overlapping discovery.  There's at least one inventor in

9   common with patents in the IPR as well as the patents both in

10  the first case and the second case and patents that can't even

11  be -- for which they can't even file an IPR.

12       So there's not -- there's not going to be an outcome here

13  where all of the patents will be either subject to an IPR or

14  going to be one of these three that we're discussing today.

15       **THE COURT:**  Well, you know, I respect your effort to

16  move things along, but I suppose I would be more receptive if I

17  thought that there was really a long delay entailed in waiting

18  for the CMC in early February.  But in the grand scheme of life

19  with these cases, that's not a long standdown, and I am going

20  to feel like I know a lot more and can make more educated calls

21  on the questions of where we draw lines in this case then than

22  I do now.

23       And so you may be right that the overlap is such that at

24  the end of the day the same discovery -- some of the same

25  discovery would have to have gone over regardless of how all

```
 1    these calls are made, and that would be more compelling to me

 2    if we were talking about a six-month delay or something like

 3    that, but this is a pretty short delay.

 4         So I think during this period of time, this is a standdown

 5    in terms of -- I think you should provide your written

 6    responses because that's one less thing that -- and as you say,

 7    you know, that is more of a staking out your legal position.

 8    But the actual process of producing materials and producing

 9    privilege logs and the like I think need to await the case

10    management conference in the first week of February.

11         So I will take the matter under submission.  I will give

12    you a written order as soon as I can.  It was very interesting,

13    helpful argument.  I appreciate it, and we'll go from there.

14              MS. DURIE:  Thank you, Your Honor.

15              THE COURT:  Thank you.

16              MR. EDWARDS:  Thank you.

17                   (Proceedings adjourned at 3:19 p.m.)

18

19

20

21

22

23

24

25
```

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, November 20, 2014

8

9

10

11    _____

12          James C. Pence, RMR, CRR, CSR No. 13059
                   U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25